# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

In Re:

MIRABILIS VENTURES, INC.,

     Debtor.

_____/

MIRABILIS VENTURES, INC.,

     Plaintiff,

v.

SAXON, GILMORE, CARRAWAY,
GIBBONS, LASH & WILCOX, P. A.;
and HANS C. BEYER, An individual and
as Attorney/Agent with SAXON, GILMORE,
CARRAWAY, GIBBONS, LASH AND
WILCOX,

     Defendants.

_____/

CASE NO.: 6:08-bk-04327-KSJ

CHAPTER 11

ADV. PRO. NO.: 6:08-ap-00227-KSJ

## AMENDED COMPLAINT

Plaintiff, Mirabilis Ventures, Inc., ("MVI"), by and through its undersigned counsel, and pursuant to Rule 7003 and Rule 7015, *Federal Rules of Bankruptcy Procedure*, hereby files its Amended Complaint and sues Defendants, SAXON, GILMORE, CARRAWAY, GIBBONS, LASH & WILCOX, P. A. ("Saxon Gilmore") and HANS C. BEYER ("Beyer"), individually and as Attorney/Agent with SAXON, GILMORE, CARRAWAY, GIBBONS, LASH & WILCOX, P. A. (collectively, "Defendants"), and in support states as follows:

## I. NATURE OF THE ACTION

This is an action for compensatory damages against the Defendants stemming from their involvement and representation of MVI and its subsidiaries including but not limited to AEM. In

summation, Beyer, as an attorney/agent of Saxon Gilmore, provided legal advice and otherwise consulted Mirabilis regarding the legality and treatment of the acquisition of certain assets that were to be paid to the IRS as payroll taxes, through bankruptcy filings and other restructuring. Saxon Gilmore failed to properly supervise the activity of Beyer, including but not limited to, their conflict of interest that occurred when Beyer and Saxon Gilmore began drafting bankruptcy documents on behalf of other business entities, of which Mirabilis was a creditor. Due to Beyer and Saxon Gilmore's actions and inactions, Mirabilis is seeking damages.

## II. JURISDICTION AND VENUE

1. This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. §1334 and 28 U.S.C. §157 because it arises in and is related to a case under Title 11 of the United States Code.

2. Defendants are subject to the personal jurisdiction of this Court because many of the tortuous acts alleged herein occurred in or were directed to the state of Florida. Furthermore, Defendants are also subject to personal jurisdiction pursuant to 18 U.S.C. §1965(d). Defendant, Saxon Gilmore, is a Florida professional association with its principal place of business in Hillsborough County, Florida.

3. Venue is proper in this district pursuant to 28 U.S.C. §1409, 28 U.S.C. 1391(b), and 18 U.S.C. §1965(c).

4. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A) and 28 U.S.C. §157(b)(2)(O).

## III. THE PARTIES AND OTHER RELEVANT ENTITIES

5. Plaintiff, MVI, is a Nevada corporation with its principal place of business located at 341 N. Maitland Ave., Suite 201 in Maitland, Florida.

6.     Defendant, Saxon Gilmore, is a full service law firm located and doing business in Dade County, Florida

7.     Defendant, Beyer, is a resident of the State of Florida and an attorney licensed to practice law in the state of Florida and at all times material hereto was an agent of Saxon Gilmore.  Beyer's acts, representations, and omissions alleged herein were made within the course and scope of his agency with Saxon Gilmore.  Saxon Gilmore is liable for all acts, representations, and omissions made by Beyer in connection with its representation of MVI, its related companies and its subsidiaries, including AEM, when Beyer was employed by the law firm.

8.     All conditions precedent to the bringing of this action has occurred, or their performance has been waived by Defendants.

## IV.  THE SUNSHINE COMPANIES

9.     In 2004, Presidion Corporation ("Presidion") entered into a consulting agreement with AQMI Strategy Corporation ("AQMI") to provide consulting work regarding the divestiture and liquidation of certain wholly owned subsidiaries of Presidion.

10.     The Presidion subsidiaries are more commonly know as The Sunshine Companies ("Sunshine Companies").[1]

11.     The deal was an arms-length transaction and both parties were represented by counsel.

12.     During this time Presidion and the Sunshine Companies had a large amount of outstanding payroll tax liabilities.

---

[1] Consisting of (1) Sunshine Staff Leasing, Inc.; (2) Sunshine Companies II, Inc.; (3) Sunshine Companies III, Inc.; and (4) Sunshine Companies IV, Inc.

13.     AQMI's engagement and proposed resolution centered on the deconsolidation, divestiture and liquidation of the Sunshine Companies.

14.     AQMI's strategy regarding liquidations involved using the funds resulting from the divestiture to pay creditors, including the Internal Revenue Service ("IRS").

15.     The proposed strategy allowed Presidion to deconsolidate its financials and separate itself from the excessive liabilities associated with its subsidiaries, allowing it to continue to conduct business as a going concern ("Sunshine Companies Plan").

16.     On or about January 6, 2005, AQMI and its various professionals, including Beyer, met with IRS revenue officer, Judith Berkowitz to inform the IRS of the estimated tax debt of the Sunshine Companies and the plan for resolution of the debt.

17.     The IRS never objected to the plan or otherwise raised any issues regarding the illegality of the Sunshine Companies Plan.

## V.    THE PERSIDION REORGANIZATION PLAN AND MIRABILIS VENTURES, INC.

18.     On October 28, 2004, the entity known as Stellar Industries, Inc. changed its name to Mirabilis Ventures, Inc.  At its inception, Mirabilis had only one shareholder (Yaniv Amar) and only one director (Gailie Hartman).  A true and correct copy of the Restated Articles of Incorporation and Written Action of The Directors of Mirabilis are attached hereto as **composite Exhibit "A"**.

19.     Mirabilis was a private equity company, which acquired companies that had a strategic fit into its unique business model.  Acquired companies either fit into the four primary specialization categories – real estate, construction, chain store development, and human resources – or they provided necessary goods and services to the core companies.

20.     In May 2005, AQMI was approached again by Presidion regarding further problems with Presidion's remaining PEO operations, particularly PSI and its wholly-owned PEO operating subsidiaries, Professional Benefits Solutions, Inc. a/k/a Presidion Solutions, VII, Inc. ("PBS") and Paradyme, Inc. ("Paradyme").

21.     The problems stemmed from the threatened cancellation of worker's compensation insurance coverage, shortfall of working capital for PEO operations, and a tax liability which had increased to over three million dollars since January 2005.

22.     Drawing from what appeared to be the success of the previous Sunshine Companies Plan, AQMI proposed a plan of reorganization designed to restore, preserve and maximize the inherent value of Presidion's assets ("PBS Plan").

23.     The PBS plan would utilize Mirabilis, and specifically, AEM, to acquire and rehabilitate the Presidion PEO Book of Business.

24.     A key element of the reorganization plan called for the interim nonpayment of federal employment taxes by PBS.

25.     The collected taxes would then be truthfully reported but not remitted.

26.     The collected, yet unpaid, taxes would then be used to fund the PEO operations, particularly paying workers' compensation insurance premiums, reorganize advisors and secured creditors.

27.     This would allow the business to continue until it was restored to a position wherein it could pay all of its outstanding liabilities, including the outstanding tax liabilities ("PBS Plan").

28.     In order for the PBS Plan to be accomplished, the Sunshine Plan would also have to be finalized, drawing the two plans together.

29.     The PBS Plan and Sunshine Plan were then brought to the attention of Mirabilis for consideration.

## VI.  RETENTION AND INVOLVEMENT OF HANS C. BEYER BY MIRABILIS VENTURES, INC. AND ITS SUBSIDIARIES AND THE APPROVAL OF THE PBS PLAN

30.     In 2004, Beyer was originally retained by AQMI to give legal advice regarding the legality of the Sunshine Companies Plan and to assist with the tax treatment and classification of the same in all bankruptcy related matters.

31.     Upon information and belief, Beyer was employed by Saxon Gilmore from February 2005 to the date of this Amended Complaint.

32.     In early 2005, drawing upon his knowledge of the common issues of fact and law from the Sunshine Companies Plan among other represented qualifications, Beyer began consulting or otherwise advising Mirabilis and its subsidiaries.

33.     During this time, Beyer began providing legal advice to Mirabilis and its subsidiaries while Beyer was employed by Saxon Gilmore.  A true and correct copy of the January 4, 2005 memorandum detailing some of Beyer's preliminary tasks and duties under the PBS Plan and Sunshine Plan is attached hereto as **Exhibit "B".**

34.     During this time, Beyer became so involved with the PBS Plan, that in December 2005, Beyer **as a now employee and officer of Mirabilis**, while simultaneously working as an attorney for Saxon Gilmore, Beyer began consulting or otherwise advising Mirabilis and its subsidiaries regarding the PBS Plan and the implementation of the Sunshine Companies Plan.

35.     In fact, Beyer completed drafts of bankruptcy petition schedules which acknowledged the increasing tax liability of PBS and Paradyme in advance of a potential decision to file bankruptcy on behalf of PSI as part of the PBS Plan.  A true and correct copy of a

proposed plan of reorganization regarding one of the Sunshine Companies including the treatment of their tax claim is attached hereto as **Exhibit "C"**.

36.     However, curiously, Beyer, while employed by Mirabilis and Saxon, drafted a Presidion Plan of reorganization on behalf of Mirabilis, but disclosed them as a prospective creditor, which is clearly a conflict of interest.  A true and correct copy of the draft Petition schedule is attached hereto as **Exhibit "D"**.

37.     Beyer knew or should have known that Mirabilis relied on these bankruptcy petitions when determining whether the PBS plan should be approved.

38.     In March, 2006, Beyer compiled all transactional documents in connection with the PBS Plan and spoke with other Mirabilis officers, employees and directors regarding the PBS Plan and its legality.  A true and correct copy of the correspondence regarding the same is attached hereto as **Exhibit "E"**.

39.     Beyer was especially interested in the success of the PBS Plan and Sunshine Companies Plan because Beyer had a vested interest in its approval.

40.     In fact, for every deal that Beyer was able to bring to the table for Mirabilis, Beyer would receive a finder's fee.

41.     Furthermore, in furtherance of the PBS Plan, Beyer referred Saxon Gilmore, and thus to himself directly, matters for the firm to work on regarding among other things, insolvency and plans of reorganization to assist with the Plan.

42.     Further, Beyer even attended meetings with the IRS during his employment at Saxon and as an officer of Mirabilis regarding the PBS Plan.  A true and correct copy of the expense report and flight log evidencing that in April 2006, Beyer flew to Miami on the

Mirabilis jet to discuss the implications and legality of the PBS Plan with the IRS is attached hereto as **composite Exhibit "F".**

43.     After this meeting, Beyer then sent a draft version of an offer of compromise for tax payers regarding the PBS Plan and Sunshine Companies Plan which was sent from Beyer to Shane Williams and others as an officer of Mirabilis is attached hereto as **Exhibit "G".**

44.     On July 1, 2006, after receiving advice from Beyer and other professionals, Mirabilis and AEM acquired the PEO book of business, its financial affairs and the PEO operations.

45.     AEM and Mirabilis took over the PEO book of business with the belief that their actions were legal and proper based on the representations of Beyer and other professionals.

46.     Through 2005 and 2006, Saxon Gilmore invoiced and Mirabilis paid over Two Hundred and Seventy Thousand Dollars ($270,000.00) for legal fees. A true and correct copy of an accounting statement evidencing payments made by Mirabilis to Saxon Gilmore is attached hereto as **Exhibit "H".**

## V.     THE UNITED STATES OF AMERICA'S CIVIL FORFEITURE ACTION AGAINST MIRABILIS

47.     In late November 2006, Mirabilis executives were notified that a federal grand jury investigation had commenced with regard to the operations of Presidion and Mirabilis.

48.     A week later, Mirabilis' auditor of nearly eighteen months raised a concern about the potential illegality of failing to pay the outstanding payroll taxes.[2]

49.     Subsequent to this time, the United States of America filed an *in rem* civil forfeiture action against the assets of Mirabilis.

_____

[2] James Moore & Co., one of Florida's largest independent auditing firms, prepared audited financials for Mirabilis in 2005.

50.     By January 2007, Mirabilis and AEM had laid off all non-key employees, including a number of officers and managers, and had closed a majority of its businesses.

51.     This allowed Mirabilis to sustain operations and remain current with its taxes.

52.     Unfortunately, news of the federal grand jury investigation and nonpayment of payroll taxes leaked to the press, resulting in several negative articles, which decimated the PEO book of business and destroyed the operations of Mirabilis.

53.     On or about May 1, 2007, Mirabilis was forced to liquidate its operations and sold the PEO book of business to O2HR, LLC for approximately Fifteen Million Dollars ($15,000,000.00).

54.     On May 27, 2008, the Debtor filed its voluntary petition for relief with the Middle District of Florida Bankruptcy Court (the "Petition Date").

55.     The Chapter 11 filing came primarily as a result of an *in rem* civil forfeiture action filed by the United States of America against certain assets of Mirabilis, which effectively caused Mirabilis to be unable to pursue claims and litigation against various third parties.

56.     The *in rem* civil forfeiture action was filed based upon the criminal investigation of Mr. Amodeo.

57.     In an effort to preserve equity for all of its creditors and other potential creditors, Mirabilis deemed a Chapter 11 liquidation plan as in the best interest of all its creditors.

## VI.  COUNT I – NEGLIGENCE (ALL DEFENDANTS)

58.     MVI re-alleges and re-states paragraphs 1 through 57 as if fully set forth herein.

59.     At all times material hereto, an attorney-client relationship existed between MVI and Defendants.

60.     By accepting employment to render legal advice to MVI, Defendants had

a duty to use such skill, prudence, and diligence as other attorneys of ordinary skill and capacity commonly possesses and exercises in the performance of the tasks they undertake.

61.     Defendants breached their aforementioned duties and deviated from the applicable standards of professional care, by virtue of their conduct described hereinabove, including but not limited to, Defendants failure to advise MVI, its subsidiaries and related companies that the Sunshine Companies Plan, PBS Plan and MVI's operations could result in criminal and civil liability for MVI, its subsidiaries and related companies.

62.     As a direct and proximate result of the Defendants' negligence, MVI, its subsidiaries and related companies have suffered damage to their business, property, as well as its creditors, and accordingly seek compensatory damages.

WHEREFORE, Plaintiff, Mirabilis Ventures, Inc. ("MVI"), demands judgment against Defendants: (1) awarding the amount of principal damages incurred by MVI due to Defendants' actions; (2) awarding prejudgment and post-judgment interest at the maximum rate allowed by law; (3) awarding court costs; and (4) awarding any other relief this Court deems appropriate.

## VII.   COUNT II – BREACH OF FIDUCIARY DUTY (ALL DEFENDANTS)

63.     MVI re-alleges and re-states paragraphs 1 through 57 as if fully set forth herein.

64.     At all times material hereto, a fiduciary relationship existed between MVI, its subsidiaries and related companies and Defendants, particularly, an attorney-client relationship existed between MVI, its subsidiaries and related companies and Defendants.

65.     Defendants each breached their fiduciary duties to MVI, its subsidiaries and related companies by virtue of their conduct described hereinabove, particularly, Defendants each failed to advise MVI that entities with the authority to exercise significant control over the financial affairs of a company have a statutory duty to collect, withhold, truthfully account for,

and pay over payroll "trust fund" taxes and that failure to intervene to stop and/or mitigate the nonpayment of collected payroll "trust fund" taxes collected could result in significant liability, particularly criminal liability, despite multiple requests from MVI as to the potential consequences of the Sunshine Companies Plan, PBS Plan and MVI's operations.

66.     As a direct and proximate result of Defendants' breach of fiduciary duties, MVI, its subsidiaries and related companies have been damaged in their business and property, and accordingly seek compensatory damages.

WHEREFORE, Plaintiff, Mirabilis Ventures, Inc. ("MVI"), demands judgment against Defendants: (1) awarding the amount of principal damages incurred by MVI due to Defendants' actions; (2) awarding prejudgment and post-judgment interest at the maximum rate allowed by law; (3) awarding court costs; and (4) awarding any other relief this Court deems appropriate.

## VIII.   <u>COUNT III</u>
## <u>NEGLIGENT MISREPRESENTATION (ALL DEFENDANTS)</u>

67.     MVI re-alleges and re-states paragraphs 1 through 57 as if fully set forth herein.

68.     This is a cause of action against Defendants for negligent misrepresentation.

69.     Defendants knew, or should have known, that MVI, its subsidiaries and related companies were relying on the information supplied and representations and statements made by Defendants in connection with their representation of MVI's entities in deciding how to run and operate their businesses.

70.     Defendants owed MVI, its subsidiaries and related companies a duty of reasonable care, skill and diligence to ensure that all of the information supplied and representations and statements made to or on behalf of MVI and its related entities were true and accurate.   This duty required Defendants to reasonably investigate the facts pertinent to the

representation and provide MVI and its related entities with true and accurate information in connection with their legal representation.

71.     Defendants breached their duty by making material negligent misrepresentations and omissions described above when in the exercise of reasonable care should have known facts or circumstances indicating that these negligent misrepresentations and omissions were materially misleading at the time they were made.

72.     As a direct and proximate result of the negligent misrepresentations made by Defendants, MVI, its subsidiaries and related companies have suffered damages to their business and property, and accordingly seek compensatory damages.

WHEREFORE, Plaintiff, Mirabilis Ventures, Inc. ("MVI"), demands judgment against Defendants: (1) awarding the amount of principal damages incurred by MVI due to Defendants' actions; (2) awarding prejudgment and post-judgment interest at the maximum rate allowed by law; (3) awarding court costs; and (4) awarding any other relief this Court deems appropriate.

### IX.   COUNT IV
### PROFESSIONAL NEGLIGENCE (ALL DEFENDANTS)

73.     MVI re-alleges and re-states paragraphs 1 through 57 as if fully set forth herein.

74.     This is a cause of action against Defendants for professional negligence.

75.     As a result of their legal representation of MVI, its subsidiaries and related companies, Defendants knew or should have known that MVI and its entities were relying on their work product, representations, and statements in deciding how to operate and conduct their businesses.

76.     Defendants owed a duty to MVI, its subsidiaries and related companies to exercise reasonable care, skill, and diligence in order to ensure that all of the information

obtained and supplied to MVI, in connection with their legal representation, was true and accurate.

77.     Defendants breached their duty of care by making the misrepresentations and omissions described above when, in the exercise of reasonable care; they should have known that these misrepresentations were misleading at the time they were made.

78.     As a direct and proximate result of the professional negligence of Defendants, MVI, its subsidiaries and related companies have suffered damages to their business and property, and accordingly seek compensatory damages.

WHEREFORE, Plaintiff, Mirabilis Ventures, Inc. ("MVI"), demands judgment against Defendants: (1) awarding the amount of principal damages incurred by MVI due to Defendants' actions; (2) awarding prejudgment and post-judgment interest at the maximum rate allowed by law; (3) awarding court costs; and (4) awarding any other relief this Court deems appropriate.

## X.  COUNT V
## NEGLIGENT SUPERVISION (AGAINST SAXON GILMORE)

79.     MVI re-alleges and re-states paragraphs 1 through 57 as if fully set forth herein.

80.     This is a cause of action against Saxon Gilmore for the negligent supervision of Beyer.

81.     Saxon Gilmore owed MVI, its subsidiaries and related companies a duty to use reasonable care in supervising the conduct and activities of Beyer in connection with their representation of MVI, its subsidiaries and related companies.

82.     Saxon Gilmore breached its duty of reasonable care by failing to supervise Beyer to ensure that his conduct and activities were not fraudulent or deceptive and that all of his work product and representations on behalf of MVI were true and accurate and to prevent any conflict of interest in drafting bankruptcy documents for companies in which Mirabilis was a creditor.

83. Saxon Gilmore also breached its duty of reasonable care by failing to supervise the trust account of MVI and its related entities.

84. As a direct and proximate result of this breach, MVI and its related entities have suffered damages to their business and property, and accordingly seek compensatory damages.

WHEREFORE, Plaintiff, Mirabilis Ventures, Inc. ("MVI"), demands judgment against Saxon Gilmore: (1) awarding the amount of principal damages incurred by MVI due to Saxon Gilmore's actions; (2) awarding prejudgment and post-judgment interest at the maximum rate allowed by law; (3) awarding court costs; and (4) awarding any other relief this Court deems appropriate.

Respectfully submitted this 18th day of March, 2009.

/s/Elizabeth A. Green    
Elizabeth A. Green
Florida Bar No. 0600547
Jennifer S. Eden
Florida Bar No. 0867594
Latham, Shuker, Eden & Beaudine, LLP
390 North Orange Avenue, Suite 600
Orlando, Florida 32801
Telephone: (407) 481-5800
Facsimile: (407) 481-5801
Attorneys for Debtor/Plaintiff

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

In Re:

MIRABILIS VENTURES, INC.,

     Debtor.

_____/

MIRABILIS VENTURES, INC.,

     Plaintiff,

v.

SAXON, GILMORE, CARRAWAY,
GIBBONS, LASH & WILCOX, P. A.;
and HANS C. BEYER, An individual and
as Attorney/Agent with SAXON, GILMORE,
CARRAWAY, GIBBONS, LASH AND
WILCOX,

     Defendants.

_____/

CASE NO.: 6:08-bk-04327-KSJ

CHAPTER 11

ADV. PRO. NO.: 6:08-ap-00227-KSJ

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the AMENDED COMPLAINT has been furnished via U.S. Mail and facsimile to: **David B. King, Esq.** and **Thomas A Zehnder, Esq.**, King Blackwell Downs & Zehnder PA, 25 East Pine Street, Orlando, FL 32801, **Joseph H. Varner, III, Esq.,** Knopik Varner Moore, One Harbour Place Suite 800, 777 S. Harbour Island Blvd., Tampa, FL 33602 and Mirabilis Ventures, Inc., c/o **R.W. Cuthill, Jr.,** 341 Maitland Blvd., Suite 120, Maitland, Florida 32751 on this 18th day of March 2009.

                         /s/ Elizabeth A. Green
                         Elizabeth A. Green, Esq.